1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4

5

6

CALIFORNIANS FOR DISABILITY
RIGHTS, INC. ("CDR"), CALIFORNIA
COUNCIL OF THE BLIND ("CCB"),
BEN ROCKWELL, AND DMITRI
BELSER, on behalf of all others similarly
situated,

No. C 06-5125 SBA

**ORDER**

[Docket Nos. 316, 323, 340]

7

                    Plaintiffs,
          vs.

8

9

10

CALIFORNIA DEPARTMENT OF
TRANSPORTATION ("CALTRANS")
and WILL KEMPTON, in his official
capacity,

11

                    Defendants.
_____/

12

13        On July 14, 2009, this court heard oral argument on Defendant's motion for summary

14   judgment. [Docket No. 323].[1]  Ankush Argawal and Gregory Hurley appeared for Defendants

15   California Department of Transportation ("Caltrans") and Caltrans Director Will Kempton.

16   Laurence Paradis appeared for Plaintiffs.  Having considered the motion, the supporting, opposing

17   and reply memoranda, the evidence before the court, and the arguments of the parties, the Court

18   hereby DENIES Defendants' motion for summary judgment.

19                            **INTRODUCTION**

20        Defendants move for summary judgment on two issues: (1) whether Caltrans' policies for the

21   design of pedestrian facilities comply with federal law and regulations[2]; and (2) whether Caltrans

22   has system-wide procedures to ensure that pedestrian facilities are designed and constructed

23   pursuant to its design policies. [Defs' Reply at 1:7-10].  Defendants argue that no injunctive relief is

24   _____

25   [1]The Court also has considered Defendant's request for judicial notice, Docket No. 316, and
     Plaintiff's request for judicial notice, Docket No. 340.  Both requests are GRANTED.

26

27   [2]The federal laws and regulations presented and discussed by the parties with respect to the motion
     for summary judgment are Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42
     U.S.C. § 12132, 28 C.F.R. § 35.151, and Section 504 of the Rehabilitation Act of 1973 ("Section
28   504"), 29 U.S.C. § 794.

1    needed to bring its design policies and implementation procedures into compliance and thus, request

2    summary judgment on Plaintiffs' case in its entirety.

3          Plaintiffs contend that the scope of the alleged violations, and thus, the lawsuit, is much

4    broader than Defendants assert.   In addition to whether Caltrans' design guidelines and procedures

5    violate the ADA and Section 504, their claims address numerous ways in which Caltrans has

6    allegedly failed to comply with its legal obligations to provide accessible pedestrian facilities in the

7    following ways: (1) failing to provide "program access" to existing pedestrian facilities; (2) failing

8    to develop an effective public complaint system through which complaints regarding specific access

9    barriers can be remedied in a timely and satisfactory manner; (3) failing to provide access to

10   Caltrans' newly constructed or altered pedestrian facilities, *e.g.* not installing or upgrading curb

11   ramps to comply with federal accessibility standards when Caltrans alters an adjoining roadway or

12   pedestrian facility; (4) failing to develop or implement procedures to actually monitor compliance;

13   (5) failing to remedy the effects of past non-compliant design guidelines; (6) failing to ensure that

14   temporary pedestrian routes, when provided around construction work that blocks a pedestrian

15   facility, are accessible to persons with mobility and/or vision disabilities; and (7) by contending that

16   no federal accessibility standards are legally binding when Caltrans engages in new construction or

17   alteration affecting its pedestrian facilities.

18         Because the majority of these claims are not addressed by the Defendants' motion, the Court

19   treats the motion as one for partial summary judgment.   On the two issues raised by Defendants, the

20   Court finds that genuine issues of material fact exist as to each, thereby precluding the Court from

21   summarily adjudicating them in Defendants' favor.

22                                    **BACKGROUND**

23   **I.      Procedural Background.**

24         On March 13, 2008, this Court issued a ruling on Defendants' motion for judgment on the

25   pleadings, holding that Plaintiffs do not have a "private right of action to enforce either the

26   self-evaluation or transition plan regulations." [Docket No. 207 at 12:24-25].   The Court explicitly

27   stated, however, that "plaintiffs' other claims under the ADA, as well as § 504 of the Rehabilitation

28   Act, remain intact." [Id. at 13:5-8].   Contrary to Defendants' contention, this Court's ruling did not

                                            2

1  eliminate Plaintiffs' claim premised on Defendants' failure to provide program access to existing

2  pedestrian facilities.  Specifically, the Court found that while Plaintiffs may not rely on their

3  allegations about violations of the Self-Evaluation and Transition Plan regulations to demonstrate a

4  violation of the access requirements for existing pedestrian facilities (*i.e.* program access), they may

5  nonetheless litigate the barriers to access along existing pedestrian facilities under Title II of the

6  ADA. [Docket No. 237 at 3:25-4:2].

7       The Court certified a class of "all persons with mobility and/or vision disabilities who are

8  allegedly being denied access under Title II of the Americans with Disabilities Act and the

9  Rehabilitation Act of 1973 due to barriers along sidewalks, cross-walks, pedestrian underpasses,

10 pedestrian overpasses and any other outdoor designated pedestrian walkways throughout the state of

11 California which are owned and/or maintained by the California Department of Transportation."

12 [Docket No. 237 at 13:27:7-10].  The class was thus certified not as to certain claims (*i.e.* design

13 policies and implementation procedures) but as to the alleged  denial of access due to barriers along

14 Caltrans' pedestrian facilities.

15 **II.     The relevant statutes and regulations.**

16      The ADA provides that "no qualified individual with a disability shall, by reason of such

17 disability, be excluded from participation in or be denied the benefits of the services, programs, or

18 activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

19 12132-12164. The regulations define "facility" to include "all or any portion of . . . roads, walks, or

20 passageways."  28 C.F.R.§35.104.  Streets and sidewalks are a program and service provided by the

21 City.  *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir.2002).

22      Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §794, prohibits

23 discrimination on the basis of handicap in any program or activity receiving Federal financial

24 assistance.  A "program" or "activity" means, in part, "all of the operations" of a state or local

25 agency. 29 U.S.C. §794(b).

26      Under 28 C.F.R. § 35.151, each new facility or part of a facility constructed or altered after

27 January 26, 1992, must conform to the ADA Accessibility Guidelines for Buildings and Facilities

28 ("ADAAG"),  the Uniform Federal Accessibility Standards ("UFAS").  28 C.F.R. § 35.151(c).

3

1  "Departures from particular requirements of either standard by the use of other methods shall be

2  permitted when it is clearly evident that equivalent access to the facility or part of the facility is

3  thereby provided." *Id*.  This regulation applies to public entities, including Caltrans.

4       The Department of Transportation ("DOT") is the agency responsible for overseeing

5  compliance with the ADA by public entities with respect to "programs, services and regulatory

6  activities relating to transportation."  *See* 28 CFR §35.190(b)(8). The DOT delegates the

7  responsibility to ensure ADA compliance in the public right of way and on projects using surface

8  transportation funds to the Federal Highway Agency ("FHWA").  The FHWA considers the public

9  right of way to include travel lanes, medians, planting strips, and sidewalks.

10       The ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG"), 28 C.F.R. Pt.

11  36 App., sets forth the minimum accessibility guidelines needed to measure compliance with ADA

12  Title III obligations in planning and engineering new construction and alterations projects for

13  privately-owned public accommodations and commercial facilities.  The Defendants' position that

14  no federal accessibility guidelines are legally binding on them in the context of pedestrian facilities

15  is not persuasive.  First, pedestrian facilities which are newly constructed or altered are clearly

16  subject to §35.151(c), which in turn explicitly requires that a public agency adopt one of two federal

17  accessibility standards:  ADAAG or UFAS.  A departure from a particular requirement of the

18  ADAAG or UFAS is permitted only to the extent that it is "clearly evident" that the method selected

19  "provides equivalent access to the facility."  Second, the Court is persuaded by the caselaw that

20  finds these standards legally enforceable and applicable to Title II entities, such as Caltrans.  *See*

21  *Lopez v. San Francisco Unified School Dist.,* 385 F.Supp.2d 981, 985 (N.D.Cal. 2005) (granting

22  plaintiffs' motion for partial summary judgment regarding their claims that defendant public entity

23  failed to perform new construction and alterations in conformance with the ADA Accessability

24  Guidelines); *Ability Center of Greater Toledo v. City of Sandusky*, 133 F.Supp.2d 589, 592

25  (N.D.Ohio 2001), *affirmed by Ability Center of Greater Toledo v. City of Sandusky*,385 F.3d 901

26  (6th Cir. 2001) (rejecting as mistaken the City's argument that the regulations do not demand "strict

27  compliance" as long as the facilities "when viewed in their entirety," and holding that the standard

28  for new facilities is more stringent than that for existing facilities).  *See also Pierce v. County of*

*Orange,* 519 F.3d 985, 1010 (9th Cir. 2008); *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000).

### LEGAL STANDARD

The judgment sought in a motion for summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Hart v. Parks*, 450 F.3d 1059, 1065 (9th Cir. 2006).  As to materiality, the substantive law will identify which facts, if any, are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Miller v. California*, 212 Fed. Appx. 592 (9th Cir. 2006).

Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248; *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002).  Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

### DISCUSSION

**I.     Whether Caltrans' design policies comply with federal laws and regulations.**

The first issue which Defendants seek to have summarily adjudicated is whether Caltrans' policies for the design of pedestrian facilities complies with Title II of the ADA, Section 504 and Section 35.151 of the Title II implementing regulations.  It is undisputed that the Design Information Bulletin No. 82-03: Pedestrian Accessibility Guidelines for Highway Projects  ("DIB 82-03") is the master document for the design policies followed by Caltrans for newly constructed and altered sidewalks, crosswalks and other pedestrian walkways.  DIB 82-03 was issued in October 2006 and revised in September 2007.

DIB 82-03 is divided into sections addressing pedestrian accessibility (Section 4.1), new construction (Section 4.1.1), alterations (Section 4.1.2), accessibility requirements for roadway rehabilitation projects (Section 4.1.3), and minimum accessibility features (Section 4.1.4). [Cordova Decl., Ex. A]. Sections 4.3 through Section 4.3.19 include design standards and best practices for pedestrian facilities that cover features of the public right-of-way. [Cordova Decl. ¶ 4].

DIB 82-03 incorporates access guidelines from three sources: (1) ADAAG; (2) California Building Standards Code ("CBSC"); and (3) Draft Guidelines for Public Rights-of-Way ("DGPROW").  Although ADAAG is not specifically written for public rights-of-way projects, Caltrans applies some of its provisions to the highway environment.  It is incorporated in Section 4.3.1 (surface), Section 4.3.2 (vertical clearance), Section 4.3.3 (clear width), Section 4.3.5 (cross slope), Section 4.3.8 (curb ramps), Section 4.3.14 (detectable warning surfaces) and Section 4.3.19 (protruding objections).

It is undisputed that the CBSC, also incorporated in DIB 82-03, is substantially equivalent, or even more stringent, than ADAAG.  Finally, although it is undisputed that the DGPROW is not legally enforceable because it was withdrawn by the Department of Justice on January 21, 2009, DIB 82-03 incorporates it as well.  [Cordova Decl. ¶ 7 and Ex. B].

Defendant contends DIB 82-03 complies with the federal laws and regulation at issue in this case because the access policies contained therein either comply (the ADAAG and the CBSC) or are considered "best practices" (DGPROW).  Defendant argues that because the FHWA approved DIB 82-03 as a design guide that conforms to the ADA, the Court should defer to the FHWA's judgment rather than substitute its own.

Plaintiffs present evidence of purported deficiencies in the current DIB 82-03. One significant example which raises disputed factual issues relates to Section 4.2, which excludes highway shoulders from accessibility requirements:

> Vehicular lanes and shoulders are not required to be designed as accessible pedestrian routes even where it is legal for a pedestrian to traverse along a highway.

[Cordova Decl., Ex. A, DIB 82-03].

Plaintiffs' position is that where a highway shoulder is the equivalent of a sidewalk and is used by pedestrians, it must be accessible.  Defendants contend they are not legally obliged to design highway shoulders as accessible pedestrian routes.  They concede, however, that in those cases where a highway shoulder is "specifically intended for pedestrian use," it must be accessible.  Thus, to the extent that the DIB 82-03 does not contemplate the accessibility of highway shoulders that are intended for pedestrian uses, there appears to be no dispute that Caltrans' policy to the contrary does

1    not comply with the ADA.

2         A second purported deficiency is the failure of DIB 82-03 to address the issue of temporary

3    accessible pedestrian routes around construction.  In ruling on Defendants' Motion for Judgment on

4    the Pleadings and Plaintiffs' Cross Motion for Summary Judgment, this Court held that, to the extent

5    Defendants elect to provide temporary routes for the use of the public, Defendants have a duty to

6    make such routes accessible to all members of the public. [Docket No. 292].  The failure of DIB 82-

7    03 to address temporary routes is additional evidence that Caltrans' design policy does not comply

8    with the the federal accessibility laws and regulation at issue in this matter.

9         Finally, Defendants claim that "FHWA's review and approval of the DIB as an ADA

10   compliant design guide for pedestrian features in the public right-of-way is undisputed."  [MSJ

11   13:12-14]. The Court, however, is persuaded by Plaintiff that the FHWA's purported review and

12   approval of DIB 82-03  is far from undisputed, as is the question of its ADA compliance.

13   Defendants offer into evidence a copy of a letter from Mark Leja, of the Caltrans Division of

14   Design, to Gene Fong, Division Administrator of the FHWA, dated October 19, 2006. [Cordova

15   Decl. Ex. D].  The letter relates to DIB 82-03 and states: "Your signature will constitute an

16   agreement between the Federal Highway Administration and our Department that DIB 82-03 is an

17   approved design guide for the California State Highway System.  Enclosed is a copy for your

18   records."  The letter is not signed by Gene Fong, but by Bill (last name undecipherable) "for Gene

19   Fong," and is dated October 20, 2006.

20        The letter is inadmissible and incompetent evidence.  First, it is clearly hearsay under Federal

21   Rule of Evidence 801(c), given that it is proffered to prove the FHWA's imprimatur on DIB 82-03.

22   Second, it is not authenticated and lacks foundation.  Defendants have failed to submit any evidence

23   demonstrating the circumstances of the letter and/or the authority of the person who ostensibly

24   signed it.  Clearly, the person to whom it was directed, Gene Fong, did not.  *See Orr v. Bank of

25   America*, 285 F.3d 764, 777 (9th Cir.2002); *see also* Fed.R. Evid. 901(a). Consequently, whether or

26   not the FHWA has approved the DIB 82-03 is a disputed factual issue which is material to the issues

27   presented by Defendants.

28        Even if the FHWA approved DIB 82-03, the Defendants' argument that the Court should

7

1   defer to the FHWA rather than substitute its judgment is inapposite.  Moreover, the Defendants'

2   analysis of *Overton Park*[3] is inapplicable.  This Court is not reviewing a decision of the FHWA, it is

3   reviewing Caltrans' design policies and procedures in adjudicating their compliance with federal

4   accessibility laws.

5          The evidence demonstrates there are genuine disputes over material facts with respect to

6   whether Caltrans' design policies comply with the ADA, Section 504 and Section 35.151. The Court

7   therefore DENIES the Defendants' motion on the first issue.

8   **II.     Whether Caltrans has system-wide procedures to ensure that pedestrian facilities are**

9   **designed and constructed pursuant to its design policies.**

10         Defendants contend that no injunctive relief is required to revise Caltrans' current procedures

11  for several reasons.  First, all projects involving the construction or alteration of pedestrian facilities

12  must be designed in accordance with the policies and standards of DIB 82-03. [MSJ at 18].  For

13  example, the Highway Design Manual explicitly requires compliance with DIB 82-03. [Land Decl. ¶

14  5].  Second, in the design process, if an access standard in the DIB 82-03 cannot be fully

15  incorporated in a project's design, an exception must be documented and approved.  The exception

16  must be fully documented to demonstrate why compliance is structurally impracticable (for a new

17  construction) or technically infeasible (for alterations).  Before an exception can be approved, a

18  professional registered civil engineer must scrutinize it. [Cordova Decl. ¶ 16].  Cost cannot be a

19  factor to justify an exception, and this is explicitly set forth in DIB 82-03.  *Id*. At the end of the

20  design process, the designer certifies compliance with DIB 82-03 before submitting the project's

21  plans and specifications for construction. [Land Decl. ¶ 8].  Any changes during construction are

22  subject to reevaluation by the design staff to ensure compliance. Finally, Caltrans offers a statewide

23  training program on the policies and procedures of DIB 82-03. [Cordova Decl. ¶ 18].  Attendees

24  include design and traffic engineers involved in designing pedestrian facilities and conducting

25  accessibility investigations.  There is no evidence that the training is mandatory.

26  _____

27  [3]*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  The standard of review of a
28  federal agency decision is whether the agency's determination was arbitrary, capricious or an abuse
    of discretion, or otherwise not in accordance with the law.

Plaintiffs do not dispute that the procedures exist on paper.  They respond with circumstantial evidence of Caltrans' failure to comply with its own design policies in the form of real-world documentation of inaccessibility in the built environment.   This is presented in the expert's report, in the form of a survey of 41 locations in which he identifies both necessary curb ramps that are missing, and extant curb ramps that are not accessible under the ADA, Section 504 and 28 C.F.R. 35.151. The three main alleged defects in the extant curb ramps are (1) a transition at the bottom of the curb ramp to the roadway that is not flush, making it dangerous for a scooter or wheelchair user to use the curb ramp without tipping over or falling out of the scooter or chair; (2) an abrupt change in level, or "bulge" where the gutter meets the street adjacent to the curb ramp, creating a dangerous barrier to scooter or wheelchair use; and (3) the absence of a detectable warning feature to alert pedestrians with vision disabilities that they are about to transition between the safety of the sidewalk and the hazardous environment of the street. [Docket No. 337, Margen Decl. ¶¶ 42-44].

Plaintiffs also submit the declarations of individual class members who detail their individual experiences with inaccessible pedestrian facilities in their own communities.  For example, Dwight Bateman has a mobility disability and uses a wheelchair.  He lives in Modesto, California and describes his difficulty using the sidewalks along McHenry Avenue due to several access barriers. Four intersections on McHenry Avenue, in particular, feature large tar bumps in the gutter near each of the curbs where road resurfacing layers have not been smoothed out.  In order to make it onto the curb ramp over the abrupt changes in level, he must slow down and put one of his hands on the back side of his power wheelchair so that the jolt of going over the bump does not shake his body and cause back strain, exacerbating the back injury that caused his mobility disability in the first place, or simply cause him to fall out of his chair.  He recounts that it takes time and effort to negotiate the bump, and he is often still in the crosswalk when the traffic light changes, which is dangerous if the oncoming cars do not see him in the crosswalk before they proceed into the intersection.  On one occasion in 2007, this danger was realized when an oncoming car did not see him in the crosswalk and accelerated at the green light.  He had to slam his power wheelchair in reverse to avoid being hit by the car, and believes that had he been in his less powerful wheelchair, he would not have been

able to avoid being hit.  Bateman also describes that in early 2009, the curb ramps at these
intersections were redone with new cement, which ended up exacerbating the abrupt changes in
level created by the tar bumps. [Appendix of Class Members' Declarations, Bateman Decl. ¶¶ 8-10].

Elizabeth Henry has a mobility disability and uses a wheelchair.  She lives in Redwood City,
California, and travels as a pedestrian along the El Camino Real to take her child to and from public
school, and to shop and buy groceries.  On several occasions while crossing the intersection of El
Camino Real and Jefferson Avenue, the wheels of her wheelchair have hit the abrupt change in level
near the gutter where it meets the asphalt, and caused things to fall off her lap and onto the ground.
One, she hit the abrupt change hard enough to be propelled forward out of her chair and onto the
ground.  Another time, her child was in her lap, and she hit the abrupt change hard and the child fell
onto the ground. [Appendix, Henry Decl. ¶¶ 1, 7-8].  Henry generally avoids using ramps with
barriers, but cannot avoid the intersection with Jefferson Avenue because it is the only way to get
from her house to many locations she frequents in town.

Dimitri Belser is legally blind and uses a cane to navigate when traveling pedestrian rights-
of-way. [Appendix, Belser Decl. ¶ 1].  He frequently uses the sidewalks on San Pablo Avenue in
Berkeley, California, between Ashby Avenue and Dwight Avenue.  Along Ashby Avenue, in
particular, there are very few detectable warnings at curb ramps, and without them it is difficult to
safely cross the street because he cannot tell when he is moving from the relative safety of the
sidewalk into the street filled with cars.  On one occasion in 2006, while waiting to cross Ashby
Avenue at Martin Luther King Jr. Way,, his cane was actually struck by a car and pulled from his
hands.  He believed he was standing on the sidewalk and had no idea he was so close to the street.
[Id. ¶¶ 8, 11, 12].  Lillian Scaife is also legally blind and complains of the blended curb that was
installed at the intersection of Temple Avenue and Pacific Coast Highway in Long Beach,
California, five years ago, which has no detectable warnings to assist her in understanding whether
she is standing in the street or on a sidewalk. [Appendix, Scaife Decl. ¶¶ 1, 6-7].

Plaintiff's evidence that the resurfacing of city streets created barriers to accessibility creates
genuine issues of material fact with respect to Caltrans' compliance with 28 C.F.R. 35.151.  In

*Kinney v. Yerusalim*, the Court held that the resurfacing of city streets is an alteration within the meaning of 28 C.F.R. 35.151(b).  *Yerusalim*, 9 F.3d 1067, 1075 (3rd. Cir. 1993).  An "alteration," therefore, triggers the compliance requirements in 28 C.F.R. 35.151(c). As for detectable warnings, they are required by Section 4.7.7 of the ADAAG, which Defendant concedes is incorporated in the DIB 82-03.  Thus, to the extent that curbs identified by Plaintiffs which lack detectable warnings fall within the scope of Title II of the ADA, the evidence presents genuine issues of material fact on the issue of whether the procedures in DIB 82-03 ensure compliance with federal laws and regulations. Defendants provide no evidence that Caltrans employees actually avail themselves of the procedures recited in DIB 82-03 and summarized by Caltrans Chief Engineer Richard Land, nor that training on the policies and procedures is required.  That the procedures exist on paper is insufficient to establish, as a matter of law, that they ensure compliance with the federal accessibility laws, particularly in the face of Plaintiffs' evidence of numerous access barriers in the built environment. For these reasons, the Court also DENIES the Defendant's motion for summary judgment on the second issue presented.

**III.    Program Access Claims.**

Plaintiffs allege that Caltrans has systematically violated the requirements to provide program access to existing pedestrian facilities (constructed prior to and not altered since January 26, 1992) by failing to remedy numerous and pervasive access barriers, including but not limited to missing curb ramps, unsafe curb ramps, dangerous cross-slopes, crumbled and uneven pavement and inadequate detectable warnings.  They present evidence in support of these claims in the form of twenty declarations detailing the access barriers faced by class members on a daily basis.  The parties agreed, at the hearing, that the factual issue of what constitutes a "barrier" is disputed.  This particular claim, however, is not the subject of Defendants' motion for summary judgment and need not be adjudicated here, but is reserved for trial.

**<u>CONCLUSION</u>**

For the reasons discussed above, the Court DENIES the Defendants' motion for summary judgment .

1        IT IS SO ORDERED.

2  Date:8/4/09

3                                  Saundra Brown Armstrong
United States District Judge