1    LAURENCE PARADIS (STATE BAR NO. 122336)
     MARY-LEE E. KIMBER (STATE BAR NO. 239086)
2    DISABILITY RIGHTS ADVOCATES
     2001 Center St., Third Floor
3    Berkeley, CA 94704
     Telephone:      (510) 665-8644
4    Facsimile:      (510) 665-8511
     TTY:            (510) 665-8716
5    Email:          general@dralegal.org

6    DANIEL B. KOHRMAN (DC BAR NO. 394064)
     JULIE NEPVEU (DC BAR NO. 458305)
7    AARP FOUNDATION LITIGATION
     601 E Street, NW
8    Washington, DC 20049
     Telephone:      (202) 434-2060
9    Facsimile:      (202) 434-6424
     Cell:           (202) 316-19910
10   Email:          dkohrman@aarp.org
                     jnepveu@aarp.org
11
     JOSÉ R. ALLEN (STATE BAR NO. 122742)
12   Pro Bono Counsel
     Four Embarcadero Center, Suite 3800
13   San Francisco, CA 94111
     Telephone:      (415) 984-6400
14   Facsimile:      (415) 984-2698

15   Attorneys for Plaintiffs

16              UNITED STATES DISTRICT COURT

17            NORTHERN DISTRICT OF CALIFORNIA

18
     CALIFORNIANS FOR DISABILITY          Case No. C-06-5125 SBA
19   RIGHTS, INC. ("CDR"), CALIFORNIA
     COUNCIL OF THE BLIND ("CCB"),        **CLASS ACTION**
20   BEN ROCKWELL and DMITRI
     BELSER, on behalf of themselves, and on
21   behalf of all others similarly situated,   **REPLY DECLARATION OF
                                             LAURENCE W. PARADIS IN SUPPORT
22   Plaintiffs,                             OF PLAINTIFFS' MOTION FOR
                                             REASONABLE ATTORNEYS' FEES
23   v.                                      AND COSTS**

24   CALIFORNIA DEPARTMENT OF           Date:  May 13, 2010
     TRANSPORTATION ("Caltrans") and WILL   Time:  10:00 a.m.
25   KEMPTON, in his official capacity,   Judge:  Hon. Maria-Elena James

26   Defendants.

27

28

I, Laurence W. Paradis, declare:

     1.     I have personal knowledge of the facts contained in this declaration and, if called as a witness, am competent to testify as to those facts.

     2.     I am an attorney at law, duly licensed to practice law in all state and federal courts of the state of California and in a number of other federal and state courts.  I have been the lead attorney in the instant federal action and the related state court action (hereafter this "litigation"), and have been continually involved in this litigation throughout.

     3.     Plaintiffs' moving papers provide time and expense records for all three Class Counsel firms up through February 28, 2010, and indicated we would update this information for further time and expenses with these reply papers.  Accordingly, attached hereto as **Exhibit A** is a true and correct copy of a chart that accurately reflects the updated total hours and fees by firm and timekeeper for all work by all three Class Counsel firms in this litigation, as well as the total costs incurred by Class Counsel.  This chart also reflects Class Counsel's voluntary five-percent deduction from requested fees on the merits.

### DRA'S POST MARCH 1, 2010 MERITS PHASE LODESTAR HOURS

     4.     Additional fees requested by Disability Rights Advocates ("DRA") for work on this litigation since March 1, 2010, are set forth below.  True and correct copies of DRA's billing records indicating the hours worked and the tasks completed by DRA staff on merits work during this period are submitted herewith as **Exhibit B** to this declaration.  These records provide detailed descriptions of the work conducted.  Substantial additional work had to be undertaken by Class Counsel since March 1, including time spent responding to class member inquiries, preparing responses to a number of objectors to the settlement, and preparing for the Final Approval hearing.   DRA took the lead on all of these matters.  As detailed in these records, DRA's additional billable fees on the merits since March 1, 2010 total $135,556.50.  When added to the billable fees through February 28, 2010 on the merits issues in the litigation as described in Plaintiffs' initial motion ($7,587,670.50), DRA's updated total fees for merits work amount to $7,723,227.

5.      The following are DRA's requested current hourly rates for attorneys and staff who worked on the merits issues in the two related cases since March 1, 2010, together with the number of hours billed since then, itemized by timekeeper:

| Timekeeper | Year of Graduation | Current Hourly Rate | Billable Hours | Billable Fees by Timekeeper |
|---|---|---|---|---|
| Sid Wolinsky | 1961 | $835 | 2.9 | $2,421.50 |
| Laurence Paradis | 1985 | $730 | 85.1 | 62,123.00 |
| Melissa Kasnitz | 1992 | $650 | 2.1 | 1,365.00 |
| Ron Elsberry | 1987 | $640 | 2.8 | 1,792.00 |
| Mary-Lee Kimber Smith | 2005 | $475 | 119.2 | 56,620.00 |
| Law Clerks | N/A | $175 | 64.2 | 11,235.00 |
| **TOTAL** | | | **276.3** | **$135,556.50** |

## DRA'S ADDITIONAL COSTS

6.      Attached hereto as **Exhibit C** is a summary of additional costs reasonably accrued by DRA that were not included with the costs submitted in connection with Plaintiffs' initial motion (and summarized in Exhibit G to my original declaration). These additional costs amount to $1,879.36. When included with the previous costs submitted with Plaintiffs' initial motion ($288,543.50), the total of DRA's costs to date are $290,422.86.

7.      Defendants challenge Plaintiffs' claim for recovery of costs relating to Mr. Margen's services as an expert witness in the two cases, claiming that Mr. Margen's trial testimony was somehow deficient. Opposition at 25:11-19. Mr. Margen in fact provided essential expert witness services and testimony that were key in enabling Plaintiffs to obtain the results that were achieved in the litigation. Mr. Margen conducted multiple site visits of Caltrans facilities up and down the state, oversaw a team of experts that inspected a sample of Caltrans' resurfaced roadways to evaluate compliance with heightened access standards, reviewed and analyzed many different Caltrans' policy documents, was deposed by Defendants on three separate occasions, and testified during each of the first three days of trial. His 45-page expert witness report identified and explained multiple deficiencies in Caltrans' policies and practices.

1    His expert testimony provided the basis for many of the changes ultimately made by Caltrans as

2    part of the settlement agreement.

3          8.     Moreover, Judge Armstrong relied directly on Mr. Margen's expert witness

4    investigation and report in denying Defendants' Motion for Summary Judgment.  Docket No.

5    357 at 9:1-13.

6          9.     As for Mr. Margen's trial testimony, during day one of the trial Defendants

7    challenged his capacity to testify as an expert, yet, after extensive voir dire by defense counsel,

8    Judge Armstrong ruled that he was qualified to testify as an expert on Plaintiffs' behalf.

9    Defendants nevertheless criticize the qualifications and abilities of Mr. Margen by quoting, out

10   of context, certain remarks by Judge Armstrong during his cross-examination testimony.  Mr.

11   Hurley did manage to distort some of Mr. Margen's opinions during the cross-examination, but

12   Plaintiffs were prepared to correct these distortions during the redirect examination.  The fact is,

13   however, that the trial was recessed during Defendants' cross-examination of Mr. Margen, and

14   before any redirect by Plaintiffs.  In addition, the case settled before trial resumed.  Therefore, it

15   is impossible to assess how Mr. Margen's testimony, as a whole, would have been evaluated by

16   the Court or affected the outcome if the case had been litigated to resolution.

17                              **DRA'S FEES ON FEES**

18         10.    Defendants argue that Plaintiffs' time spent in resolving the fees issue should be

19   reduced for supposed inefficiency.  Once again, however, it was Defendants who forced the

20   amount of time on this issue to be greater than it needed to be.  As stated in my original

21   declaration, counsel for the parties attempted on several occasions to negotiate a resolution of

22   Plaintiffs' claim for fees and costs.  The parties attended a settlement conference before

23   Magistrate Judge Laporte focused on an effort to resolve the fees and costs.  When agreement on

24   an amount could not be reached through the settlement efforts of Magistrate Judge Laporte,

25   Plaintiffs then proposed to Defendants an expedited procedure wherein the fees and costs issue

26   would be submitted to an arbitrator, with the arbitrator's decision then subject to review and

27   approval by the Court.  Defendants did not agree to this proposal.  Instead, Class Counsel had to

28   spend substantial time and effort attending a further separate mediation session before Judge

1    Ramirez, Retired, at which once again no agreement was reached.  This separate mediation

2    added substantially to the "fees on fees" work that Class Counsel had to expend.  Although work

3    on the briefing for that mediation was helpful in this current fee motion, as was work on fee

4    motions in prior cases, Class Counsel could not simply "recycle" an old brief for the current

5    litigation.  Among other things, Class Counsel had to obtain evidence to establish the current

6    market rates for attorneys handling complex litigation in the Bay Area in 2010.  (No 2010 prior

7    fee motions had been prepared by Class Counsel for 2010.)  In addition, Defendants requested

8    extensive information from Class Counsel as part of the fee mediation that we provided,

9    including various backup for expenses and explanations regarding billing practices.  The time

10   spent on the current motion was reduced to the extent the prior mediation brief set forth the

11   history of the litigation, and to the extent prior fee motions set forth the law governing recovery

12   of fees and costs.  Nevertheless, Defendants have opposed this fee motion tenaciously,

13   challenging every timekeeper's rate, filing over 150 evidentiary objections (many of them

14   lacking any explanation and/or simply nonsensical – *see* Plaintiffs' Responses to Defendants'

15   Evidentiary Objections), challenging the hours spent on a variety of bases, and challenging

16   several categories of costs.  This required substantial effort by Class Counsel to pursue this fee

17   and cost motion.

18          11.     The following chart sets forth the additional hours and requested rates of staff

19   time spent on "fees on fees" since March 1, 2010.  This includes substantial time spent on

20   preparation of the moving papers for this motion (the motion was filed on March 23) and all of

21   the time spent on preparation of the reply papers.

22   //

23   //

24   //

25   //

26   //

27   //

28   //

| Timekeeper | Year of Graduation | Current Hourly Rate | Billable Hours | Billable Fees by Timekeeper |
|---|---|---|---|---|
| Sid Wolinsky | 1961 | $835 | 2.8 | $2,338.00 |
| Laurence Paradis | 1985 | $730 | 50.7 | 37,011.00 |
| Melissa Kasnitz | 1992 | $650 | 0.4 | 260.00 |
| Ron Elsberry | 1987 | $640 | 111.6 | 71,424.00 |
| Mary-Lee Kimber Smith | 2005 | $475 | 35.3 | 16,767.50 |
| Law Clerks | N/A | $175 | 22.8 | 3,990.00 |
| **TOTAL** | | | **223.6** | **$131,790.50** |

12.     Attached hereto as **Exhibit D** is a true and correct copy of DRA's detailed time records reflecting these additional hours spent on "fees on fees." In addition, I estimate that Class Counsel have spent and will spend at least 25 additional hours in completing preparation of the reply papers on this motion and in connection with the hearing on the motion, adding additional fees of approximately $15,000. In addition, I would not be surprised if Defendants contest this Court's Report and Recommendation, which could further add to the total fees and costs of the matter. Although Plaintiffs have suggested referral of this motion for a binding determination by a Magistrate Judge, Defendants have rejected that proposal as well. At the time they filed their initial motion, DRA requested $152,393.50 for fees on fees work through February 28, 2010. The additional fees reflected above bring the total fees on fees requested by DRA to $284,184, *not* including the estimated future fees of $15,000.

## RESPONSE TO VARIOUS ISSUES RAISED BY DEFENDANTS' OPPOSITION

13.     As stated in my declaration in support of Plaintiffs' initial motion, DRA's support personnel are billed at hourly rates of $265 (senior paralegal), $245 (summer associates), $225 (paralegals), $175 (law clerks), and $165 (case clerks). To the extent any support staff were not categorized by name in Plaintiffs' motion, they are classified as follows. Kaitlin Anderson, Lauren Roberts, Lena-Kate Ahern, and Sara Asrat are paralegals. Beau Saccoccia, Zander Carbajal, and Cat McCulloch are law clerks. Alicia Reyes and Stephanie Cox, both college graduates who worked under the supervision of an attorney, were billed as law clerks.

14.     Contrary to the implication of Defendants, Katie Weed was identified in my original declaration (Paradis Decl. ¶ 25 (Docket No. 462)) as a senior paralegal, and thus her rate was specified.  As explained in my original declaration, Ms. Weed was an attorney actually admitted to practice in another state and had in fact practiced law for over three years in a litigation firm in another state prior to joining DRA.  Accordingly, she was more than qualified to be billed as a "Senior Paralegal" when she worked on this litigation.  To the extent any time was billed by Rebecca Williford, a law school graduate not yet admitted to practice, her time was no-charged and not included in the chart of total fees sought by Plaintiffs.  DRA includes word processing charges as costs, and they are listed as such in Exhibit G to my original declaration. (Docket No. 462-7).  DRA bills for word processing at $85 per hour and recorded 41.8 hours of such word processing time in this litigation.

15.     Mr. Hurley suggests in his declaration that my experience in civil rights litigation did not begin until 1996, when I left my partnership at my private law firm and joined DRA as Executive Director and Co-Director of Litigation.  In fact, my experience in disability rights litigation began in approximately 1990, when I began taking on pro bono access lawsuits.  From 1990 through 1995, I handled increasingly complex disability rights class action litigation, including a class action housing access case against the San Francisco Public Housing Authority, a class action access case against the San Francisco Municipal Railway, and a nationwide class action access case against United Artists Cinemas, among other access cases.  Prior to 1990, I worked extensively on class action commercial litigation, developing experience that was directly useful in my later disability rights class action work.  I thus have approximately 25 years experience in class action litigation, including 20 years specifically in disability rights litigation.

16.     Defendants challenge two categories of Plaintiffs' time based on supposed "Bad Faith Tactics."  See Declaration of Gregory Hurley, ¶ 46.  Mr. Hurley's account of the proceedings as related in this section of his declaration, however, is misleading.

17.     First, Mr. Hurley challenges all of Class Counsel's time spent in connection with the deposition of Defendants' access expert, Bill Hecker.  Mr. Hurley suggests that Class Counsel sent their highest billing attorney to Alabama for that deposition in order to increase the

1  costs of the litigation.  Mr. Hurley's version of the events, however, is not accurate.  The actual

2  events were as follows:  Defendants, for reasons not explained, chose an access consultant

3  located in Alabama – Bill Hecker – as their designated trial expert in the federal action.

4  Defendants produced, as the expert witness "report" for Mr. Hecker, a one page letter from the

5  consultant to Mr. Hurley stating that the consultant had reviewed Caltrans' policies and found

6  them to be compliant with the ADA.  (Plaintiffs' access expert – Mr. Margen – had produced a

7  45-page expert witness report plus extensive exhibits detailing all of the work he had done and

8  each of the specific opinions he had reached and the basis for each of these opinions.)  There was

9  no detail provided of what Mr. Hecker had actually done to reach his conclusion.  Plaintiffs thus

10  had no choice but to take Mr. Hecker's deposition to prepare to cross-examine him at trial.  Due

11  to the press of litigating both the federal and state actions at the same time, Class Counsel had to

12  divide work preparing for taking and defending various expert witness depositions.  I took

13  responsibility for Plaintiffs' access expert and Mr. Allen took responsibility for Defendants'

14  access expert, Mr. Hecker.  Plaintiffs then tried to work out a plan with Defendants for the

15  deposition of Mr. Hecker.  As Mr. Hecker's billable rate was much less than that of Mr. Allen, I

16  suggested to Mr. Hurley that Mr. Hecker come to California for the deposition.  Plaintiffs were

17  prepared to split the cost of Mr. Hecker's travel for such purposes.  Defendants refused and

18  insisted that Class Counsel travel to Alabama for the deposition.  I pointed out that this would

19  increase the cost of the litigation more than if Mr. Hecker came to California.  Mr. Hurley still

20  did not agree.  I do not recall saying that Mr. Allen would bill "door to door" or laughing about

21  this, and that is not my manner of meet and confer.  I do recall saying in a calm fashion that

22  Plaintiffs would seek to recover for Mr. Allen's travel time if Plaintiffs' ultimately prevailed, but

23  mentioned this simply in an effort to explain why it would be in both sides' interest to bring Mr.

24  Hecker to California for the deposition.  Ultimately, Mr. Allen did have to fly to Alabama to take

25  Mr. Hecker's deposition.  That deposition obtained a number of admissions that were helpful to

26  Plaintiffs' case.

27          18.       Defendants also challenge Class Counsel's time spent on a motion for case

28  coordination.  The events concerning this motion were as follows:  When Defendants forced the

1   state law claims in this action to be dismissed without prejudice and refiled in state court, this

2   development created uncertainty with regard to which court would decide the program access

3   claims.  Both federal law and California state law contained requirements that state agencies

4   make their programs accessible by removing barriers in existing facilities ("program access").

5   The California state program access laws were more extensive than the federal law claims,

6   however, in that it appeared (and Judge Freedman so ruled) that California law provided a

7   private right of action to enforce the self evaluation and transition plan requirements.  Plaintiffs

8   thus sought to have all of the program access claims resolved in the state court action.  Plaintiffs

9   were concerned, however, that simply dismissing the program access claims from the federal

10  action would allow Defendants to assert that they could not be heard in the state action due to

11  principles of res judicata and collateral estoppel.  In fact, Defendants had already tried to assert

12  such principles in order to bar Plaintiffs' state law self evaluation and transition plan claims from

13  being heard by the state court.  Accordingly, to avoid issue preclusion, Plaintiffs proposed to

14  Defendants that the parties stipulate to a stay of the program access claims in the federal action

15  specifically so these claims could be tried and resolved in the state court action.  Attached hereto

16  as **Exhibit E** is a true and correct copy of a letter I wrote to defense counsel proposing this plan

17  for coordination of the actions.  This plan was consistent with the representations Class Counsel

18  made to the state court that Plaintiffs would pursue the program access claim in the state court

19  action rather than federal court action.

20          19.    Defendants, however, would not agree to this coordination proposal, and

21  Plaintiffs therefore filed a motion in the federal action requesting that the Court order such

22  coordination.  Docket No. 294.  Defendants opposed this motion, arguing that "Plaintiffs are able

23  to and should try each and every one of their purported claims in this [federal] action . . . ."

24  Docket No. 302 at 2.  The Court denied Plaintiffs' motion for coordination.  Docket No. 307.

25  Thus, contrary to Mr. Hurley's declaration (¶ 46(b)), Defendants actually precluded Plaintiffs

26  from moving the program access claims from the federal action to the state action in a way that

27  would avoid the possibility of res judicata or collateral estoppel.  The state court was informed of

28  Judge Armstrong's decision, and Caltrans renewed its motion to stay the state court action based

1    on that decision.  The state court rejected that renewed motion to stay, concluding that Plaintiffs

2    should be able to pursue their state law claims concerning the self evaluation and transition plan

3    requirements.  Ultimately, however, at the pretrial conference Judge Armstrong *did* dismiss the

4    program access claims from the federal action but she did so specifically without prejudice so

5    that they could be tried in the state court – which was consistent with what Plaintiffs had

6    proposed and sought all along.  If Defendants had simply stipulated to the proposed coordination

7    plan, the matter could have been resolved without any confusion.  Instead, Defendants' actions

8    and strategy greatly complicated the issue.

9            20.      I was the lead attorney for Plaintiffs and Class Counsel in *National Federation of*

10    *the Blind v. Target Corp.*, No. C 06-01802 MHP, 2009 WL 2390261 (N.D. Cal. Aug. 3, 2009),

11    and was in charge of litigating Plaintiffs' motion to recover fees and costs in that matter.  The

12    parties agreed as part of the settlement in that case that plaintiffs' claim for fees and costs would

13    be submitted to the Court for resolution with defendant reserving all rights to challenge the

14    amount of fees and costs sought.  Defense counsel, Morrison and Foerster, filed an extensive

15    opposition to Plaintiffs' motion in that case, but did not challenge the rates sought for the

16    attorneys litigating that case.  (Defendants did unsuccessfully challenge rates sought for work of

17    support staff.)  As plaintiffs presented evidence (through a declaration of Richard Pearl) showing

18    that DRA's requested attorney rates were less than those charged by defense counsel, I was not

19    surprised that defendant chose not to challenge attorney rates in that case.

20            21.      Attached hereto as **Exhibit F** is a true and correct copy of an invoice submitted by

21    defense counsel Greenberg Traurig to the California Department of Transportation for part of its

22    work on this case together with redacted time records of the Greenberg Traurig attorneys

23    working on the defense of this litigation submitted as a part of this invoice.  These time records

24    contain extensive use of what defense counsel in their opposition to Plaintiffs' fee motion

25    describe as improper "block billing."  However, as is indicated as a part of the invoice, Caltrans

26    approved payment in full even with block billing.  These records were obtained through a Public

27    Records Act request.

28

1

**ROLE OF CALTRANS IN-HOUSEL COUNSEL**

2   22.   DRA first began investigative work on this case in July 2005. DRA made its

3   initial settlement overtures to Caltrans in June 2006. DRA filed the action on Aug. 23, 2006.

4   From the filing of the complaint until December of 2007 (almost a year and a half), Caltrans in-

5   house counsel were the only attorneys litigating. Mr. Hurley and the law firm at which he is a

6   partner, Greenberg Traurig, did not become defense counsel in this litigation until December

7   2007. Mr. Hurley's declaration provides his estimates as to rates and hours for each of the

8   Caltrans in-house attorneys who worked on this litigation. In that testimony, Mr. Hurley

9   estimates rates and hours for years including 2006 and 2007 when his firm was not retained. Mr.

10   Hurley also testifies that between 2006 and 2009 both Mr. Harrington and Mr. Agarwal each

11   spent a total of 60 hours on the case for each of those years.

12   23.   From August 2006 until December 2007, Caltrans in-house counsel, as the only

13   attorneys on the case, did, at least, the following: participated in a settlement conference in

14   December 2006, participated in a joint site visit in February 2007, participated in an initial CMC

15   in February 2007, participated in a mediation in May 2007, propounded approximately 200

16   interrogatories (signed by Ankush Agarwal on 7/12/07), propounded 400 document requests

17   (signed by Ankush Agarwal on 7/12/07), took a total of 15 depositions (7 by Michael

18   Harrington, 7 by Ankush Agarwal and 1 by Vanessa Spear), responded to 52 document requests

19   from Plaintiffs through objections and 4000 pages in documents, responded to 43 interrogatories

20   (signed by Ankush Agarwal for Michael Harrington) (and met and conferred regarding disputes

21   over these interrogatories, resulting in supplemental responses), defended 7 depositions (4 by

22   Michael Harrington, 3 by Ankush Agarwal), filed an answer to the complaint, an answer to the

23   amended complaint, a joint CMC, an opposition to a motion to expedite and a motion for

24   judgment on the pleadings (challenging among other things, the constitutionality of the ADA and

25   the private right of action to enforce the self-evaluation and transition plan regulations). We also

26   received approximately 24 different letters from Caltrans in-house counsel during this time.

27   24.   Once Greenberg Traurig were retained, Caltrans in-house counsel continued to

28   play a role in the litigation and did, at least, the following: took the lead in settlement

negotiations in May 2008, drafted Defendants' portion of a state CMC statement in July 2008, filed a motion to stay the state court action in July of 2008, filed an ex parte application in the state court action in September of 2008, filed a motion for summary judgment (seeking to dismiss all claims in the case) in the federal action in June 2009 (Ankush Agarwal personally argued this motion in front of Judge Armstrong), attended the pretrial hearing (Ankush Agarwal and Michael Harrington), attended all three days of trial (Ankush Agarwal and Michael Harrington), attended negotiation sessions from September through December 2009 (Ankush Agarwal and Michael Harrington) and drafted portions of the settlement agreement and exhibits (Michael Harrington).

25.     Based on these personal observations, I believe that Ankush Agarwal and Michael Harrington each spent more than 60 hours each year from 2006 to 2009 on this litigation.

## BILLING JUDGMENT

26.     As stated in my original declaration, DRA no charged 412.1 hours of attorney and paralegal/law clerk time through discrete deductions, at a value of $154,204.  Furthermore, to account for any remaining possible inefficiencies or billing irregularities, DRA has voluntary reduced the remaining fees for merits work by an additional across-the-board five percent.  This voluntary reduction is in addition to deductions resulting from tasks that were no-charged.

27.     Absent the negotiated fee cap, the total requested lodestar for DRA's time in the case is thus $7,723,227 for merits work.  Plaintiffs seek a 1.65 multiplier for this time, resulting in a total claim for DRA's attorneys fees of $12,743,324 for work through this date absent the fee cap.  The total requested DRA fees for work on fee matters is $284,184, and Plaintiffs estimate they will incur an additional $15,000 in future work on fee matters.  Plaintiffs do not seek a multiplier for "fees on fees" work nor for costs.  DRA's total costs through this date is $290,422.86.  DRA's total of fees and costs for work on this litigation is thus $13,332,930.

## MULTIPLIER

28.     In settlement negotiations regarding payment by Defendants to Plaintiffs for attorneys' fees and costs, Class Counsel expressly stated to defense counsel on multiple occasions that if the parties could not agree to a negotiated resolution of the amount of fees and

1  costs, forcing Plaintiffs had to bring a contested fee motion, Plaintiffs would seek a multiplier

2  enhancement to the lodestar for their work on this litigation.

3        29.    There is no doubt in my mind that the extensive hours DRA put into this litigation

4  since we first began work on the matter in July 2005 have precluded DRA from accepting many

5  other cases which would have been far less risky.  The law relating to access to pedestrian

6  facilities has been and remains uncertain.  The proposed regulations on access to pedestrian

7  facilities have still not been finalized and adopted by the U.S. Department of Justice.  Defendants

8  in this case thus argued that absent such regulations there was no enforceable requirement that

9  Caltrans' pedestrian facilities be made accessible.  There is still very little precedent on many of

10 the other issues that were hard fought in this litigation.  Among other things, there was no

11 precedent whatsoever on the California state law private right of action to enforce the self

12 evaluation and transition plan regulations.  Also, there was no precedent on the issue of

13 upgrading existing but deficient curb ramps during roadway alterations.  Furthermore, there was

14 great conflict of authorities on the issue of the continuing violation doctrine applicable to

15 sidewalk access barriers.  Also, Caltrans had amassed substantial evidence in support of its claim

16 of an undue burden defense to the program access claim.  In addition, Caltrans fought class

17 certification in every way possible, including contesting whether it even had jurisdiction over

18 portions of the state roadway system, challenging numerosity, and submitting declarations from

19 class members who claimed opposition to class certification.  There was also no precedent

20 whatsoever on the issue of access to temporary pedestrian routes, and Caltrans vigorously

21 opposed Plaintiffs' claims on this issue.  In addition, Caltrans resisted discovery throughout the

22 proceedings and forced Plaintiffs to bring motion after motion in order to marshal the evidence

23 needed.  All in all, this has been one of the most hard-fought class actions I have ever litigated.

24 Along the way, DRA was forced to turn down a great variety of much less complicated cases,

25 including cases concerning access to restaurants, service stations, and many other types of public

26 accommodations.  The law regarding access to such facilities is far more developed and such

27 cases would have been much more reliable sources of revenue.

28

30.     On several occasions during this litigation, Class Counsel notified Defendants and defense counsel of the fees and costs Plaintiffs had incurred and expected to incur if the case proceeded to trial.

31.     Although DRA does seek charitable donations to support our work, our organization could not survive without obtaining substantial attorneys fees in those complex class action cases where we do prevail.  Such fees provide the essential revenues that keep DRA going, and enable us to continue taking on precedent setting cases.  DRA's costs in this litigation have been over $280,000.  The time spent by our attorneys and support staff on the litigation has been enormous, and has put a substantial strain on the organization.  Nevertheless, DRA put in that amount of time and effort needed to provide the highest caliber representation to the class consisting of hundreds of thousands of people with disabilities throughout the state, and DRA is committed to follow-up monitoring of compliance with the settlement for its thirty-year duration. A recovery of substantial attorneys fees is critical to help ensure DRA can continue this type of ground-breaking advocacy work.

32.     Attached hereto as **Exhibit G** are excerpts from a true and correct copy of the daily transcript from the Fairness Hearing for final approval of the Settlement Agreement, held on April 27, 2010.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on April 29, 2010, in Berkeley, California.

_____/s/_____
LAURENCE W. PARADIS