FOUR EMBARCADERO CENTER
SUITE 3800
SAN FRANCISCO, CALIFORNIA 94111-4144

(415) 984-6400

DIRECT DIAL
(415) 984-6442
EMAIL ADDRESS
JRALLEN@SKADDEN.COM

September 26, 2009

Via Facsimile and Email

Gregory F. Hurley, Esq.
Greenberg Traurig, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612

RE: Californians for Disability Rights, Inc., et al. v. California Department of Transportation, et al., Case No. C 06-05125 SBA

Dear Greg:

I write in response to your letter to Mary-Lee Kimber dated September 25, 2009, in which you contend that Plaintiffs have failed to set forth the legal and factual basis for their annotations to DIB 82-03 and that Plaintiffs' proposed changes to the DIB raise "new claims for injunctive relief beyond the scope of this case." Your assertions, like so many others you have made in prior correspondence and during the course of trial, are utterly false. As Judge Larson observed in connection with your attacks on an award of attorneys fees, your allegations are "inflammatory, baseless, and unprofessional." Kittok v. Leslie's Poolmart, Inc., No. EDCV 08-832 (OPx), 2009 WL 2855878, at *4 (C.D. Cal. Sept. 4, 2009).[1] Upon the resumption of trial we intend to bring these and other falsehoods to the attention of Judge Armstrong.

---

1 We note that you have been admonished by several other courts for your lack of candor. See Lonberg v. Home Depot Store 610, No. SACV00221DOCANX, 2000 WL 34602549 (C.D. Cal. July 2, 2000) and United States v. AMC Entm't, Inc., 232 F. Supp. 2d 1092, fn. 14 (C.D. Cal. 2002) (characterizing counsel's representations as "intellectually dishonest and insulting to th[e] Court.").

On September 22, 2009, Plaintiffs provided you with their mark-up of DIB 82-03 at the meet and confer conference. The mark-up, a copy of which is attached hereto as Exhibit A, detailed all the changes Plaintiffs believed should be made to DIB 82-03. At your request, we also provided you via email with a Word version of the document so you could make changes. The following day, September 23, 2009, Mary-Lee sent you a five-page, single-spaced letter in which she explained the legal and factual basis for the changes Plaintiffs sought to DIB 82-03. A copy of Mary-Lee's letter is attached hereto as Exhibit B.

In your letter you allege that Plaintiffs have failed to provide you with the legal and factual support for their suggested changes to DIB 82-03, but instead of focusing on the annotations we provided to you the day before, you deceptively shift attention to the deficiencies in DIB 82-03 that Larry Paradis outlined at the pre-trial conference on September 1, 2009, and then you contend that the annotations Plaintiffs provided on September 22 and explained at length in Mary-Lee's September 23 letter are "not encompassed by any of the" deficiencies Larry outlined at the pre-trial conference. It is plain that you have pursued a strategy of initially complaining that Plaintiffs have not been specific enough in describing the deficiencies in DIB 82-03 and relief they seek, and when Plaintiffs provide the specificity you demand, you turn around and claim that Plaintiffs have asserted "new" claims. This sort of gamesmanship is unproductive and needlessly consumes the limited resources of the parties. In any event, it is simply untrue that the annotations to DIB 82-03 raise new claims.

ALTERATIONS

As you well know, Plaintiffs have long contended that the definition of "alteration" in the DIB is unlawful because it enables the design engineer to avoid upgrading curb ramps simply by determining that the curb ramp work is outside the "scope of the alteration project" or does not "physically impact" the adjacent sidewalk or curb ramp. 28 C.F.R. § 35.151(b) and Kinney v. Yerusalim, 9 F.3d 1067 (3d Cir. 1993) make crystal clear that the trigger for the obligation to install missing curb ramps or upgrade deficient curb ramps is whether the alteration "affects or could affect the usability of the facility or part of the facility." 28 C.F.R. § 35.151(b); Kinney, 9 F.3d at 1072-73. The inclusion in Section 4.1.2 of DIB 82-03 of notions of the "scope of the project" or of "physical impact" is contrary to law, allows Caltrans to evade its obligation to install missing curb ramps or upgrade existing deficient curb ramps when performing alterations, and creates confusion in the field.

This issue plainly falls within the scope of the points Larry identified at the pre-trial conference and which are enumerated as numbers (1) and (4) in your

letter. Moreover, Plaintiffs have set forth their position on this issue in Plaintiffs' Trial Brief (24:20-25:23); Plaintiffs' Proposed Findings of Fact and Conclusions of Law (57:2-58:17, 99:22-100:4); Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (17:1-14); and Peter Margen's Expert Report dated May 18, 2009. Your contention that this is a "new" issue is therefore wholly without merit.

CAPITAL PREVENTIVE MAINTENANCE (CAP M) PROJECTS

Plaintiffs also contend that Section 4.1.2 of DIB 82-03 is unlawful because it excludes so-called "Capital Preventative Maintenance" Projects (Cap M Projects) from the type of alterations projects that would trigger the obligation to install missing curb ramps or upgrade existing curb ramps. Plaintiffs contend that only routine maintenance projects, such as filling potholes are not considered "alterations" within the meaning of 28 C.F.R. § 35.151(b). The Department of Justice (DOJ) made this clear in section II-6.6000 of the ADA Title II Technical Assistance Manual, as did the Federal Highway Administration (FHWA) in its "Questions and Answers" attachment to its memorandum dated September 12, 2006, titled, "Clarification of FHWA's Oversight Role in Accessibility." (FHWA Mem. at 5-6.)

Cap M Projects go far beyond merely filling potholes. Indeed, Caltrans' own documents reflect that Cap M Projects can involve the placement of up to 4 inches of new asphalt on a roadway surface. (Trial Ex. 1225.) This is well in excess of the 1.5 inch thickness that the Third Circuit found to constitute an alteration in the Kinney case. 9 F. 3d at 1070. In addition, Caltrans' own documents indicate that the purpose of a Cap M Project is to improve ride quality and serviceability of pavements and extend pavement service life a minimum of five years. (Trial Ex. 1257.) Furthermore, Caltrans has classified Cap M Projects as a major rehabilitation/replacement project. (Trial Ex. 819.) All of these factors indicate that a Cap M Project "affects or could affect" the usability of the roadway within the meaning of 28 C.F.R. § 35.151(b), and therefore would trigger the obligation to install missing curb ramps or upgrade existing curb ramps.

Nonetheless, it appears that the sole basis for excluding Cap M Projects from classification as an alteration is the fact that certain maintenance funds can be used to perform Cap M Projects. However, nothing in the DOJ Title II regulations authorizes Caltrans to exclude projects from classification as an alteration merely because of the source of the funding used to perform the alteration work. In short, the source of the funding is irrelevant to the question of whether the project affects or could affect the usability of the facility.

The unlawfulness of DIB 82-03 as it relates to Cap M Projects is plainly embraced in categories (1) and (4) of Larry's statements at the pre-trial conference. In addition, Plaintiffs raised the issue in their Trial Brief (25:24-26:1); Plaintiffs' Proposed Findings of Fact and Conclusions of Law (58:10-17); and Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (17:8-14). There is nothing new about this issue.

COST CAP

Plaintiffs also contend that Caltrans has unlawfully utilized a cost cap to limit the amount of access work to be performed in connection with an alteration project. The DOJ and FHWA have made clear that cost cannot be used to avoid performing access work triggered by an alteration project. The only exemption from compliance with this obligation is where it can be demonstrated that the access work is technically infeasible.

Although the unlawful cost cap language and accompanying cost table have been removed from 82-03, Plaintiffs contend that to the extent Caltrans failed to perform access work in the past based on the cost cap in existence at that time, Caltrans must undertake remedial measures to cure this violation of the law. In particular, Plaintiffs intend to ask the Court to order Caltrans to identify all access work that was not performed since 1992 in reliance on the cost cap and to require that all such work be performed according to a timetable to be established by the Court. Furthermore, in order to ensure that section 4.1.3 of DIB 82-03 is not used to defer to the transition plan access work that must be performed at the time of an alteration project,[2] Plaintiffs have proposed revisions to make this portion of the DIB consistent with other proposed changes to DIB 82-03.

The cost cap issue is embraced by category 1 of Larry's statements at the pre-trial conference. Moreover, it is not a new issue. Even before the filing of this lawsuit class counsel raised an objection to the cost cap and specifically alleged in Paragraph 35 of Plaintiffs' First Amended Complaint that the cost cap is unlawful. Plaintiffs also raised the issue in Plaintiffs' Trial Brief (22:24-23:25) and Plaintiffs' Proposed Findings of Fact and Conclusions of Law (56:6-27, 99:10-14).

---

2 The FHWA memorandum makes clear that access work that is triggered by an alteration project must be performed at the same time as the alteration project and may not be deferred to a later time. (FHWA Mem. at 7-8.)

LACK OF COMPLIANCE AND OVERSIGHT

Plaintiffs have contended that Caltrans has failed to ensure that personnel in the field are complying with the provisions of the DIB. In other words, Caltrans has provided inadequate oversight and enforcement to ensure that its own personnel and contractors are complying with the obligation to install missing curb ramps and upgrade existing curb ramps. Plaintiffs have proposed changes to sections 4.1.2 and 4.1.3 of DIB 82-03 to provide greater oversight of determinations that certain categories of work do not constitute an alteration and that it is technically infeasible to perform the required access work. The Court clearly has the authority to order this relief to redress Caltrans' violations of its legal obligations.

The changes proposed in this regard also fall within Category 1 of Larry's statements at the pre-trial conference. We have also outlined Plaintiffs' concerns over the lack of adequate oversight and enforcement in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (21:10-24:5); Plaintiffs' Trial Brief (26:10-20); and Plaintiffs' Proposed Findings of Fact and Conclusions of Law (59:4-16). In addition, Judge Armstrong explicitly stated in her order denying Defendants' motion for summary judgment that, "That the procedures exist on paper is insufficient to establish, as a matter of law, that they ensure compliance with federal accessibility laws, particularly in the face of Plaintiffs' evidence of numerous access barriers in the built environment." Order, dated August 4, 2009 (Document 357).

TEMPORARY ROUTES AND HIGHWAY SHOULDERS

Given all the discussion that has occurred at trial with regard to temporary routes and highway shoulders, we assume you are not contending that the proposed changes to DIB 82-03 with regard to these issues are new. To the extent you are uncertain as to the legal basis for changes proposed to DIB 82-03 for temporary routes and highway shoulders, we refer you to Judge Armstrong's prior rulings on these issues. Order, dated March 31, 2009 (Document 292); Order Denying Defendants' Pre-Trial Motion Re: Plaintiffs' Demand for Temporary Routes Not Legally Required or Warranted, dated September 14, 2009 (Document 419); Order re: Filing of Stipulations and Certification of Meet and Confer, dated September 23, 2009 (Document 433).

EXHIBITS

As to your claim that Plaintiffs have attempted to rely on untimely exhibits, as to any exhibits that were newly identified on Plaintiffs' September 4 and September 9 exhibit lists, Plaintiffs are entitled to use them as demonstrative exhibits

so long as you have been provided advance notice of our intention to use them at trial. Inasmuch as you have received notice of our intention to use these exhibits well in advance of the parties' agreement to provide 24-hour advance notice of the use of demonstrative exhibits, we assume this issue has been put to rest. If this assumption is incorrect, then please let me know immediately. Furthermore, please note that in addition to the exhibits identified in Mary-Lee's September 23, 2009 letter, we also intend to use the following additional exhibits in connection with our challenges to DIB 82-03: 36, 37, 314, 316, 356, 357, 370, 372, 401, 452, 480, 484, 487, 489, 491, 494, 497, 553, 579, 618, 619, 620, 621, 622, 638, 641, 668, 1066, 1070, 1080, 1120, 1189, and 1252. All of these exhibits were on Plaintiffs' August 2009 exhibit lists.

WITNESSES

In your letter you contend that Plaintiffs have identified "new" witnesses but you have not told us which witnesses you believe are new. All of the class members identified in Mary-Lee's letter were listed on Plaintiffs' witness list. Therefore, we do not understand the basis for your contention that these are new witnesses. Please provide me with the names of those witnesses who you contend have not been previously identified and the specific grounds for your contention.

Moreover, your assertion that Larry indicated that class member testimony would not be offered with respect to the barriers they have experienced is typical of the half-truths and misrepresentations that you have engaged in throughout this trial. As noted above, Plaintiffs provided a witness list on August 11, 2009 and again, per the Court's order, on September 3, 2009, identifying all the class members Plaintiffs intend to call at trial. In addition, Defendants included class member witnesses on their own witness list filed on August 14, 2009. Defendants have deposed many of the class members listed on both witness lists and all the class member witnesses have submitted at least one declaration during this litigation. Therefore, your professed uncertainty over the subject matter of their testimony is not credible.

I am prepared to meet with you in person or by telephone to discuss all of the issues raised in your letter as well as any other matters relating to Plaintiffs' claims, witness testimony and exhibits. My only request is that you come prepared to discuss the testimony of the witnesses and documents Defendants intend to present at trial.[3] Please confirm in writing that you will do so. I will provide you under separate

---

3 Despite Plaintiffs' repeated requests you have not identified the specific exhibits and deposition excerpts you intend to use at trial. Please do so by the close of business on September 28, 2009.

cover with a list of issues we would like to discuss with you regarding Defendants' portion of the case.

MISREPRESENTATIONS TO THE COURT

There is one final matter that I would like to address. During the trial on Monday, September 21, 2009, you asserted that you were taken by surprise that Plaintiffs are still contesting DIB 82-03 and that you understood that Plaintiffs were objecting only to DIB 82-02. (Trial Tr. 491:1-495:19.) While Larry was looking for the passage in the transcript of the pre-trial conference in which he had identified the deficiencies in DIB 82-03, you made the following statement:

> Mr. Hurley: Your Honor, we just ran a Concordance search for "-03" – that presumes, of course, that was transcribed that way – after page 26, and we weren't able to find the reference to "-03" after that.
>
> The Court: You said you – you were not able to?
>
> Mr. Hurley: Right. But, of course, it has to be – it'd have to be typed in exactly the way we wrote it.

(Trial Tr. 496:20-497:1.)

As you may recall, in response to your complaint at the pre-trial conference that Plaintiffs had refused to describe what changes they wanted to DIB 82-03, Judge Armstrong asked Larry to describe the deficiencies in DIB 82-03. Larry's description is set forth on page 85, lines 11-25 and 86, lines 1-7 of the transcript of the pre-trial conference. After he finished identifying the deficiencies Judge Armstrong asked him if there was anything else and Larry stated: "That is it for DIB 82-03." (Pre-Trial Conf. Tr. 86:14.) The transcript therefore makes clear that, contrary to your representation to Judge Armstrong, Larry did identify deficiencies in DIB 82-03 after page 26 of the transcript.

On September 23, 2009, Larry brought your misrepresentation to your attention and asked you to promptly advise the Court of your false statement. A copy of Larry's letter is attached for your reference as Exhibit C. To date, we have not received any response to the letter, although it seems that you had sufficient time to write a four-page letter complaining about the adequacy of Plaintiffs' annotations to DIB 82-03.

Furthermore, your representation to Judge Armstrong at the pre-trial conference that Plaintiffs had not informed you of the specific changes they sought to 82-03 was false. On August 3, 2009, Mary-Lee sent you a mark-up of DIB 82-03 identifying the changes Plaintiffs believed should be made to DIB 82-03. I have enclosed as Exhibit D another copy of that mark-up for your reference. Furthermore, as discussed above, Plaintiffs identified deficiencies in DIB 82-03 in numerous pre-trial filings with the Court, including Plaintiffs' Proposed Findings of Fact and Conclusions of Law. Moreover, in response to your request that Plaintiffs specify the injunctive relief they are seeking, Plaintiffs informed you during pre-trial meet and confer discussions and in a letter dated August 28, 2009 that the relief they are seeking was set forth in Plaintiffs' Proposed Findings of Fact and Conclusions of Law. A copy of the letter informing you of this fact is attached hereto as Exhibit E.

In light of the foregoing, it is nothing short of appalling that you would stand before a Federal District Court Judge and repeatedly assert that Defendants do not understand the relief Plaintiffs are seeking with regard to DIB 82-03 and that Plaintiffs have refused to inform Defendants of their position. I demand that you immediately advise me in writing whether you intend to inform Judge Armstrong of your repeated misrepresentations. In addition, if you decide to file a new certification regarding our meet and confer on Tuesday, September 22, 2009, I demand that you attach this letter to any such filing you make with the Court so that the Judge has the benefit of Plaintiffs' position. If you fail to do so I will submit this letter to the Court and inform Judge Armstrong that you expressly ignored my request to include it with your filing.

Very truly yours,

José R. Allen

cc: G. Michael Harrington, Esq.
Alana Cho, Esq.
Michael Chilleen, Esq.
Larry Paradis, Esq.
Mary-Lee Kimber, Esq.
Daniel Kohrman, Esq.
Julie Nepveu, Esq.

# EXHIBIT A

Plaintiffs' Annotated DIB 82-03

# 4.0 DESIGN GUIDANCE AND BEST PRACTICES FOR PEDESTRIAN FACILITIES

## 4.1 Pedestrian Accessibility

All pedestrian facilities on all projects are to be accessible in accordance with ~~State and~~ Federal laws. The following guidance and best practices are an attempt to capture the lessons learned through the years since the passage of the ADA and to document the The current fFederal ~~and State regulatory~~ accessibility standards that apply are contained in 28 C.F.R. Part 36 Appendix A ("ADAAG"). Early consultation with the Design Reviewer or Design Coordinator is recommended to discuss pedestrian accessibility issues and their resolution

### 4.1.1 New Construction

Federal regulations require that each facility or part of a facility constructed on State right-of-way shall be designed and constructed in such a manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities. This includes all newly constructed sidewalks, cross-walks and other pedestrian walkways. Such new construction on a State right-of-way shall be constructed in accordance with current new construction accessibility standards unless it can be demonstrated that it is structurally impracticable to meet current standards in accordance with Section 4.1.3 of this DIB.

### 4.1.2 Alterations

Federal regulations require that each facility or part of a facility altered in the State right-of-way in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities.

~~Where existing elements or spaces are altered, each altered element or space within the limits or scope of the project shall comply with the applicable requirements for new construction to the maximum extent feasible. he limits of the project refers to the work that will physically impact a pedestrian feature and the scope of the project refers to the work on a pedestrian feature identified in the project initiation document or the project report.~~

The following types of highway work are considered to be alterations of existing facilities:

1. Resurfacing, restoration and rehabilitation (RRR) work that affects the usability of ~~-will physically impact or is scoped to address existing sidewalks,~~ roadways adjacent to pedestrian facilities, cross-walks and/or curb ramps.

~~including those crossing driveways, curb ramps, and crosswalks need to be evaluated for pedestrian accessibility and comply with the guidance in Section 4.1.3 of this DIB.~~ RRR work that affects the usability of the existing roadway includes but is not limited to all roadway work that involves the removal and/or addition of a layer of roadway surface material at least one inch thick affecting one or more entire lanes of vehicular traffic for a distance of at least 100 linear feet. It also includes all roadway reconstruction or widening projects. ~~When determining the scope of a RRR project, the curb ramps immediately adjacent to the RRR work are assumed to be within the scope of the project.~~ All such highway work triggers an obligation to provide compliant curb ramps at all corners of all intersections along the resurfaced section of roadway which have pedestrian facilities through either construction of new curb ramps or upgrading of existing curb ramps. This requirement applies to curb ramps providing access in the direction of travel across the altered section of roadway and curb ramps providing access in the direction of travel parallel to the altered section of roadway. Any such project also triggers the obligation to install and/or upgrade curb ramps for any locations along the altered section of roadway where a sidewalk crosses an alleyway. Any such project also triggers the requirement to bring crosswalks and pedestrian islands at or along the altered section of roadway into compliance with the alteration requirements of the current standards.

Existing curb ramps along the altered section of roadway that do not meet current accessibility standards shall be upgraded to strictly comply with the alteration provisions of the current standards, unless it can be demonstrated that it is technically infeasible to meet current standards in accordance with Section 4.1.3 of this DIB.

Where no curb ramp currently exists serving one or more of the directions of pedestrian travel at an intersection, crosswalk or alleyway along an altered section of roadway that has adjacent pedestrian facilities, new curb ramps shall be provided in accordance with current new construction accessibility standards to the maximum extent feasible. Full compliance shall be required unless it can be demonstrated that it is technically infeasible to meet current standards in accordance with Section 4.1.3 of this DIB.

2. Traffic signalization work ~~that will physically impact or is scoped to address~~ that affects the usability of roadways adjacent to pedestrian facilities, ~~sidewalks,~~ curb ramps and/or ~~-~~crosswalks, ~~are tocomply with the pedestrian accessibility guidance in this DIB.~~ This includes but is not limited to all signal installation and major signal upgrade projects. Such work must meet current accessibility standards in accordance with this DIB.

3. Any other work that affects the usability of roadways adjacent to pedestrian facilities, sidewalks, curb ramps and/or crosswalks. ~~will physically impact or is scoped to address a pedestrian facility requires that the pedestrian facilities~~

comply with the pedestrian accessibility guidance in this DIB. This includes certain Capital preventative maintenance ("CapM") projects as set forth below. Such work must meet current accessibility standards in accordance with this DIB.

Any project categorized as Capital preventive maintenance (CapM) projects or preventive maintenance, or routine maintenance work shall be investigated to determine whether it may affect or could affect the usability of roadway adjacent to pedestrian facilities or pedestrian facility or part of the pedestrian facility. If it is determined that the work affects the usability of a section of roadway or pedestrian facility, such work must meet current accessibility standards in accordance with this DIB.- All such highway alteration projects shall be documented, reviewed and approved by the Design Coordinator. are not considered alterations. These types of projects may be designed following the guidance in this DIB, but they are not required to unless the work physically affects a pedestrian facility.

The following types of highway work are not generally considered alterations:

1. Routine maintenance (patching of potholes and sealing of cracks)
2. Thin surface treatments such as slurry seals
3. Joint repair
4. Shoulder repair
5. Signing
6. Striping
7. Repairs to drainage systems, except repairs that affect the usability of curb ramps.

For projects that affect the usability of roadways adjacent to pedestrian facilities, crosswalks, and/or curb ramps, new or upgraded curb ramps shall be provided for pedestrian facilities in accordance with the alterations provisions of the current accessibility standards to the maximum extent feasible. Full compliance is required unless it can be demonstrated that it is technically infeasible to meet current standards in accordance with Section 4.1.3 of this DIB.

For projects that affect the usability of existing sidewalks or other pedestrian walkways, upgraded sidewalks or pedestrian circulation paths shall be provided in accordance with the alterations provisions of the current accessibility standards to the maximum extent feasible. Full compliance is required unless it can be demonstrated that it is technically infeasible to meet current standards in accordance with Section 4.1.3 of this DIB.

For projects that affect the usability of roadways containing crosswalks, upgraded crosswalks shall be provided in accordance with the alterations provisions of the alterations provisions of the current standards to the maximum extent feasible. Full compliance is required unless it can be demonstrated that it is technically infeasible to meet current standards in accordance with Section 4.1.3 of this DIB.

For projects that affect the usability of existing roadways that contain crosswalks with pedestrian push buttons, pedestrian push buttons shall be made accessible in accordance with the alterations provisions of the current accessibility standards to the maximum extent feasible. Full compliance is required unless it can be demonstrated that it is technically infeasible to meet current standards in accordance with Section 4.1.3 of this DIB.

**4.1.3 Accessibility Requirements on RRR Projects for Alterations and New Construction**

RRR p Projects in the State right-of-way that are alterations (see Section 4.1.2) require upgrading existing pedestrian facilities to comply with the alterations provisions of the current reconstructing the affected existing pedestrian facilities may to full ADA accessibility standards to the maximum extent feasible, unless doing so is shown to be "technically infeasible" (see Section 2.0 "Definitions"). Projects in the State right-of-way that include new construction of facilities (see Section 4.1.1) require construction in accordance with the new construction provisions of the current accessibility standards unless doing so is "structurally impracticable" (see Section 2.0 "Definitions"). The Design Coordinator must agree with the finding that the work is technically infeasible or structurally impracticable and then approve a supporting Exception to Accessibility Design Standards document. Cost cannot be a consideration in justifying whether compliance with the current accessibility standards is technically infeasible or structurally impracticable. In addition, the accessibility needs of the communities and highway users, in particular the needs of customers with disabilities, need to be considered on each project. Early stakeholder participation, as appropriate to identify accessibility deficiencies, is recommended, especially when adding work to the Department Transition Plan.

For any pedestrian facility (e.g., curb ramp, sidewalk or cross-walk) not required to be brought into compliance with current accessibility standards at the time of new construction or alteration work, such pedestrian facility must Any pedestrian facility work that needs to be completed outside of the scope of the alteration project should be added to the Transition Plan through the following process. The pedestrian facility needing accessibility improvements must be specifically identified and documented by memorandum to the project history file. Upon concurrence from the Design Coordinator that the accessibility improvements are not required under 4.1.1 and 4.1.2, tThe District ADA Coordinator needs to must be contacted and he or she must involved in submitting transmit this information to the Headquarters Division of Civil Rights. (The District ADA Coordinators (Liaisons) are identified on the Department's Intranet site at: http://onramp.dot.ca.gov/eo/eo_ada.htm.) Externally sponsored work that is not being designed by the Department is not exempt from this requirement. Upon concurrence from the Design Coordinator that the accessibility improvements are not required under 4.1.1 and 4.1.2, tThe Department representative that is working with the external sponsor for the work is required to must contact the District ADA Coordinator and assist them the external sponsor in submitting any workthe necessary information to the Headquarters Division of Civil Rights for inclusion in the Department's Transition Plan.

### 4.1.4 Minimum Accessibility

* * *

### 4.1.5 Historic Preservation

* * *

### 4.1.6 Program Accessibility

* * *

### 4.2 Placement of Pedestrian Facilities

Vehicular lanes and shoulders are not generally required to be designed as accessible pedestrian routes ~~even where it is legal for a pedestrian to traverse along a highway~~. However, where a highway shoulder is intended by Caltrans for pedestrian use, it shall be made accessible to people with disabilities in accordance with the applicable new construction or alterations provisions of the current accessibility standards.

Many small communities in California do not have ~~pedestrian facilities~~sidewalks, ~~which were the result of~~ due to decisions ~~in the past~~ made prior to the ADA. As a community grows, and the presence of pedestrians becomes prevalent, highway improvements that include ~~pedestrian facilities~~sidewalks should be considered as part of a highway project.

~~Deciding to construct pedestrian facilities and elements where no exists is an important consideration. In built up urban areas with pedestrians present, pedestrian facilities should be constructed. In rural areas where few or no pedestrians exist it would not be reasonable or cost effective to construct pedestrian facilities. For situations between these two extremes the designer should consult with the affected local agency, and special interest groups. Any decision made should be clearly documented in the project files.~~

All pedestrian facilities proposed within the State highway right of way shall follow the guidance in Chapter 31 "Non-motorized Transportation Facilities" in the *Project Development Procedures Manual.* Pedestrian facilities proposed by non-Departmental entities within State highway access controlled right-of-way shall also comply with Chapter 17 "Encroachments in Caltrans' Right of Way," also in the *Project Development Procedures Manual.*

****

### 4.6 Temporary Pedestrian Routes During Construction

Where Caltrans elects to provide temporary pedestrian routes during construction, it must ensure that such temporary pedestrian routes are accessible to persons with disabilities.

An accessible temporary pedestrian route must contain a variety of features. See Caltrans' Guidelines Regarding the Provision of Accessible Temporary Pedestrian Routes, attached hereto as Appendix A, for specific access requirements applicable to temporary pedestrian routes. All provisions set forth in the Guidelines for Accessible Temporary Pedestrian Routes must be incorporated into all documents relating to the construction of the project. Further Caltrans must enforce compliance with these guidelines through regular and frequent inspections of construction sites.